## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHRISTY T. O'CONNELL,<br>3572 Bagley Drive<br>Mt. Pleasant, South Carolina 29466 | *<br><br>* |
| PLAINTIFF | * |
| v. | * |
| STEVEN C. BRIGHAM, M.D.<br>1 Alpha Avenue, Suite 27<br>Vorhees, NJ 08043 | *   CASE NO.:<br><br>* |
| And | * |
| VIKRAM H. KAJI, M.D.<br>1 Alpha Avenue, Suite 27<br>Vorhees, NJ 08043 | *<br><br>* |
| DEFENDANTS | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### COMPLAINT

Plaintiff, Christy T. O'Connell, by and through her attorneys, Emily C. Malarkey and Salsbury, Clements, Bekman, Marder & Adkins LLC, files this Statement of Claim against Defendants Steven C. Brigham, M.D. and Vikram H. Kaji, M.D., and states as follows.

### Parties, Jurisdiction and Venue

1.      This claim was previously field in the Health Claims Alternative Dispute Resolution Office as required under Maryland law, and arbitration of the claim was waived by the Plaintiff pursuant to §3-2A-06B(b) of the Courts and Judicial Proceedings Article.  The Statement of Claim, Plaintiff's Certificate of Qualified Expert and Report, Election to Waive Arbitration and Order of Transfer are attached as Exhibits 1 - 4 hereto.

2.      The Plaintiff Christy T. O'Connell is a resident of South Carolina.

1

3.     The Defendant Steven C. Brigham, M.D. is a physician previously licensed to practice medicine by the State of New Jersey. Upon information and belief, he resides in the State of New Jersey and regularly conducts business in the State of Maryland.

4.     The Defendant Vikram H. Kaji, M.D. is a physician licensed to practice medicine by the States of Pennsylvania and New Jersey. Upon information and belief, he resides in the State of Pennsylvania and regularly conducts business in the State of Maryland.

5.     The amount of this claim exceeds thirty thousand dollars ($30,000).

6.     Jurisdiction will be proper in the U.S. District Court based on the diversity of citizenship provision found in 28 U.S.C. § 1332.

7.     Venue will be proper in Maryland pursuant to 28 U.S.C. § 1391(a).

### Facts Common To All Counts

8.     At all relevant times, Steven C. Brigham, M.D. and Vikram H. Kaji, M.D. held themselves out to the Plaintiff, and to the general public, as experienced, competent and able physicians and/or health care providers possessing or providing that degree of skill and knowledge that is ordinarily possessed by those who devote special study and attention to the practice of medicine, particularly obstetrics and gynecology, and as such, owed a duty to the Plaintiff to render that degree of care and treatment which is ordinarily rendered by those who devote special study and attention to the practice of medicine, particularly obstetrics and gynecology.

9.     Upon information and belief, at the time of the events giving rise to this cause of action, Steven C. Brigham, M.D. was the owner of abortion clinics located in several states, including four in Baltimore, Cheverly, Frederick, and Silver Spring, Maryland, which were known alternately as either Associates in Ob/Gyn Care, LLC; American Medical Associates,

P.C.; Rose Health Services Company; and/or American Women's Services (hereinafter collectively referred to as "American Women's Services").

10.     Upon information and belief, at the time of the events giving rise to this cause of action, Vikram H. Kaji, M.D. was the Medical Director of the American Women's Services clinics, including the four Maryland clinics.

11.     Upon information and belief, Dr. Brigham exercised control over the operation of four American Women's Services clinics in the State of Maryland, including but not limited to the hiring and firing of employees and physicians to staff the clinics, negotiating contracts with physicians to provide physician services at the clinics, creating and implementing medical policies and procedures, responsibility for the delivery of quality care, and performing other aspects of management and operation. It is asserted that all of the medical policies and procedures governing patient care and the operation of the Maryland clinics was established by Dr. Brigham and were overseen and controlled by him.

12.     Upon information and belief, Dr. Kaji was hired by Dr. Brigham. It is asserted that his responsibilities as Medical Director included creating and implementing policies and procedures to be followed in the Maryland clinics, and ensuring the delivery of quality of care under Dr. Brigham's direction.

13.     In their capacity as owner and Medical Director of the American Women's Services, each of whom were aware of the policies and procedures in place at the Maryland clinics and who had substantial involvement in the creation and implementation of those policies and procedures, Drs. Brigham and Kaji owed a duty of care to the Plaintiff even though they did not directly treat her.

14.     At all relevant times, Drs. Brigham and Kaji were agents, servants, employees and/or apparent agents of Associates in Ob/Gyn Care, LLC; American Medical Associates, P.C.; Rose Health Services Company; and/or American Women's Services, and were acting in the scope of their employment and/or agency.

15.     It is further asserted that Associates in Ob/Gyn Care, LLC, American Medical Associates, P.C., Rose Health Services Company and/or American Women's Services were the "alter ego" for Dr. Brigham, inasmuch as he exercised complete domination over the finances, policy and business practices of those entities such that the entities had no separate mind, will, or existence of their own. It is further asserted that said control was used by Dr. Brigham to commit fraud or wrong and to avoid his duty of care to his patients, and to act in a dishonest and unjust way in contravention to the rights of his patients, and that such control and breach of said duty proximately caused harm to the patients and in particular, the Plaintiff.

16.     In late June of 2012, Christy O'Connell learned that she was pregnant.  She presented to her primary care provider on July 16, 2012, where a blood pregnancy test and transvaginal ultrasound confirmed that she was 8 weeks and 2 days pregnant, with an estimated date of delivery of February 23, 2013.

17.     Christy O'Connell made the difficult decision to terminate her pregnancy.  On July 26, 2012, she presented to the offices of a practice commonly called "American Women's Services" in Frederick, Maryland to obtain a consultation for an abortion. She reported at this visit that she was currently taking a variety of prescription medications, including anti-depressants, migraine medication, blood pressure medication, asthma medication, and antacids.

18.     At the appointment, Ms. O'Connell underwent a trans-abdominal ultrasound that was performed by the "office manager." Upon information and belief, the office manager did not have the appropriate qualifications, training or experience to perform or interpret obstetric ultrasound.

19.     It is asserted that not only were Drs. Brigham and Dr. Kaji aware that the "office managers" who performed and interpreted obstetric ultrasound at the Maryland abortion clinics did not have the appropriate qualifications, training or experience to do so, but also, that it was their express plan to use "office managers" in lieu of properly trained and licensed sonographers.

20.     It is further asserted that the "office manager" who performed and interpreted Ms. O'Connell's ultrasound was the agent, servant, employee and/or apparent agent of Drs. Brigham, Kaji, and American Women's Services.

21.     According to the medical records, the office manager who performed Ms. O'Connell's ultrasound estimated her fetus to be approximately 7 weeks and 4 days old. This estimate was inaccurate and underestimated the fetus's gestational age because it was made utilizing gestational sac size rather than the more accurate crown-to-rump length.

22.     Ms. O'Connell then consulted with Dr. Iris Dominy, and a plan was made to conduct a "medical" or non-surgical abortion, in which the patient takes medications designed to induce a spontaneous abortion. According to consent documents signed by Ms. O'Connell, this option is only viable for women who are 8 weeks pregnant or less.

23.     Dr. Dominy was hired by Dr. Brigham and at all relevant times, was acting as his agent, servant, employee, and/or apparent agent.

24.     The medications that were administered to Ms. O'Connell to achieve her abortion– misoprostol and methotrexate – are not FDA approved for termination of pregnancy. Methotrexate is typically used in chemotherapy for cancer patients. It was used to induce abortions before the FDA approved RU-486 (mifepristone), and can take up to eight weeks in order to successfully terminate a pregnancy.

25.     Misoprostol is a drug that is commonly used to induce labor in pregnant patients, and under certain circumstances, can be used to perform a medical abortion in combination with mifepristone/RU-486. Ms. O'Connell was not given any mifepristone, and in fact, the materials she was provided by American Women's Services, drafted and/or approved by Drs. Brigham and Kaji, falsely state that mifepristone "is still not available in the United States."

26.     Methotrexate and misoprostol are dangerous and powerful drugs. Not only do they have serious physical consequences to the mother who ingests them, but also they can cause serious and permanent harm to the fetus if the abortion is unsuccessful. Indeed, the consent form signed by Ms. O'Connell prior to undergoing her medical abortion, drafted and/or approved by Drs. Brigham and Kaji, states that the medications "are very damaging to the fetus" and "can cause severe birth defects."

27.     It is asserted that American Women's Services, acting through its agents, Drs. Brigham and Kaji, prescribed methotrexate and misoprostol as therapy for medical abortions instead of other, FDA-approved regimens in order to cut costs and maximize profits. In fact, one pill of mifepristone costs approximately $95, whereas one dose of methotrexate costs between $5 and $25. (Ms. O'Connell was charged a flat fee of $310 for her medical abortion.)

28.     Recognizing that the treatment regimen prescribed for Ms. O'Connell had the potential to be ineffective and to render severe harm to the fetus, American Women's Services required Ms. O'Connell to return to the clinic several weeks after taking the drugs in order to confirm that she was no longer pregnant.  She was advised that if the abortion was not successful, a surgical procedure would have to be performed to complete it.  The consent form she signed states:

> About 8% of women using this method will not abort and MUST UNDERGO termination by the standard vacuum aspiration method.  The drugs used in this termination are very damaging to the fetus, and if they fail to produce complete expulsion of the pregnancy, a minor surgical procedure will be performed. …. IT IS VERY IMPORTANT THAT YOU UNDERSTAND THAT ONCE METHOTREXATE HAS BEEN GIVEN, THE TERMINATION OF THE PREGNANCY MUST BE COMPLETED.   THE METHOTREXATE CAN CAUSE SEVERE BIRTH DEFECTS.

29.     On August 17, 2012, Ms. O'Connell returned to American Women's Services for her follow-up appointment.  She indicated at that visit that she was still experiencing symptoms of pregnancy.  Another transabdominal sonogram was performed by the "office manager," who interpreted the sonogram as follows: "Trans abdominal US no IUP" (indicating that no intrauterine pregnancy was seen).  The report is signed by the office manager and Dr. Dominy.  Ms. O'Connell was advised that there would be no need to conduct any urine or blood pregnancy tests to confirm that she was no longer pregnant because the sonogram was conclusive evidence that the medical abortion had been a success.  She was only advised to follow up with her primary care provider in three months, and provided a prescription for oral contraceptives.

30.     Following her abortion, which she believed to be successful, Ms. O'Connell engaged in other behavior she would not have engaged in if she were pregnant, such as drinking alcoholic beverages and taking prescription medications.

31.     On October 5, 2012, Ms. O'Connell followed up with her primary care provider for her annual "well woman" exam. During the physical exam, her doctor discovered that she was in fact still pregnant, a fact that was confirmed by urine pregnancy test.

32.     A stat ultrasound confirmed that Ms. O'Connell was still carrying a viable fetus, now more than 18 weeks' of gestational age.

33.     Ms. O'Connell's health care providers immediately took measures to adjust her prescription medication regimen, counsel her about ways to stay healthy while pregnant, and provide care for her as a high-risk obstetrical patient. She saw her obstetrician almost weekly, and obtained multiple sonograms to monitor her baby's growth.

34.     Unfortunately, Ms. O'Connell developed severe preeclampsia, or high blood pressure, a condition that can be extremely harmful and even fatal to the mother and her fetus. The only way to reverse preeclampsia is by delivering the baby.

35.     At approximately 28 weeks' gestation, Ms. O'Connell's preeclampsia was so bad that she was admitted to the hospital, where it was determined that her baby would need to be delivered. Joseph O'Connell was born on December 19, 2012. He was more than 10 weeks premature.

36.     Joseph O'Connell remained in the Neonatal Intensive Care Unit for almost two months. Upon discharge, he continued to be, and to this day continues to be, monitored by many medical specialists for multiple medical issues, including hearing loss, developmental delays, heart defects, and other problems. Many of these medical issues relate to Joseph's

8

severe prematurity, and others relate to effects the dangerous and harmful drugs prescribed to Christy O'Connell by American Women's Services.

37.     In the summer of 2013, the State of Maryland shut down three of the four American Women's Services clinics located in this State, citing reasons that included outdated equipment and poorly qualified or trained staff, including sonographers.

### Count I
### (Negligence – Dr. Brigham and Dr. Kaji)

38.     Plaintiff adopts and incorporates paragraphs 1 through 37 as if fully set forth herein.

39.     The Defendants Steven C. Brigham, M.D. and Vikram H. Kaji, M.D. were negligent and careless in the following manners:

  a.  By engaging and permitting untrained, unqualified individuals to perform and interpret obstetric sonograms;

  b.  By permitting non-physicians to interpret obstetric sonograms;

  c.  By allowing "office managers" to perform and interpret obstetric sonograms without proper supervision and guidance;

  d.  By establishing protocols that allowed and encouraged physicians to rely on the ultrasound interpretations of untrained, unqualified individuals;

  e.  By establishing a policy and protocol for medical abortion that did not take into consideration the best interest of the patient, including by using methotrexate in lieu of mifepristone,

  f.  And in other ways.

40.     As a result of the negligence of the Defendants, Christy O'Connell has been caused to suffer physical injury, severe mental anguish, and other emotional pain and

suffering, which is continuing in nature. She has also incurred, and will in the future continue to incur, substantial expenses related to the care of Joseph O'Connell, including medical and related expenses well above and beyond those incurred by a normal, healthy child.

WHEREFORE, Plaintiff, Christy O'Connell, claims damages against the Defendants, in an amount exceeding $30,000.00 to be determined by a jury, with all costs to be paid by the Defendants.

## Count II
## (Informed Consent)

41.     Plaintiff adopts and incorporates paragraphs 1 through 40 as if fully set forth herein.

42.     The Defendants Steven C. Brigham, M.D. and Vikram H. Kaji, M.D. had a legal duty and obligation to obtain adequate informed consent, including to accurately inform Christy O'Connell regarding the legal options for abortion available to her, and the material risks, benefits, and alternatives of those options.

43.     The Defendants were negligent and careless in that they failed to obtain adequate and valid informed consent from Christy O'Connell in the following ways:

    a.   By falsely informing her that mifepristone "is still not available in the United States;"

    b.   By failing to offer her medical abortion with mifepristone;

    c.   By failing to refer her to a different clinic that could provide medical abortion using mifepristone;

    d. By failing to inform her that the combination of misoprostol and methotrexate is not as effective in inducing abortion as mifepristone, especially in a pregnancy greater than 9 weeks;

    e. By failing to inform her that the combination of misoprostol and methotrexate can take up to eight weeks to successfully terminate a pregnancy;

    a. And in other ways.

44. As a result of the negligence of the Defendants in failing to provide adequate and valid informed consent, Christy O'Connell has been caused to suffer physical injury, severe mental anguish, and other emotional pain and suffering, which is continuing in nature. She has also incurred, and will in the future continue to incur, substantial expenses related to the care of Joseph O'Connell, including medical and related expenses above and beyond those incurred by a normal, healthy child.

WHEREFORE, Plaintiff, Christy O'Connell, claims damages against the Defendants, in an amount exceeding $30,000.00 to be determined by a jury, with all costs to be paid by the Defendants.

EMILY C. MALARKEY
SALSBURY, CLEMENTS, BEKMAN
    MARDER & ADKINS, LLC
300 West Pratt Street, Suite 450
Baltimore, MD 21201
410-539-6633
*Attorneys for Plaintiffs*